1840.

Hutchinson
and others
v.
Reed and oth-
ers.

HUTCHINSON AND OTHERS v. REED AND OTHERS.

THE complainants, and a firm of H. B. & Co., separately employed R. as their factor in New-York, to sell flour consigned to him. R. employed S. as his agent, and the whole business was done by him. R. died, and his administrators settled with S. and received from him the balance as stated. This sum with other monies belonging to one of the firms, was deposited in the Farmers' Loan Company. The complainants insisted that the whole belonged to them and the other firm in ascertainable proportions.—*Held,* that the members of the other firm were necessary parties to a bill filed to reach the fund. If the administrators had admitted that the relative proportions were ascertained and liquidated, they need not have been parties.

Since the decision of the house of lords in *Green* v. *Poole,* bills are never dismissed for want of parties, at least where the objection is not taken till the hearing, except where the court sees that the bill would be dismissed if the parties were before it, or where they have been omitted in bad faith. If the answer raises the objection, it is in the discretion of the court to dismiss or allow an amendment.

There is no rule of the court preventing an order at the hearing for a bill to be amended by adding a party as a co-plaintiff. The case of *Milligan* v. *Mitchell,* (1 *Mylne & Craig,* 3 *Ibid.,* and 1 *Mylne & Keene,*) examined.

The question as to the mode of bringing in new parties is to be governed by the principles of the court, looking to the rights of all parties; to its doctrine in guarding testimony; and to the most suitable frame of the record.

If the omitted party is in exactly the same relation, such as a residuary legatee or *cestui que trust,* he may be made a co-plaintiff. If he appear to have rights adverse to those of the complainant, he should be made a defendant. If the rights of a former defendant are affected, he must have an opportunity to file an answer either to an amended or supplemental bill.

The new defendant is not bound by the former depositions. It seems that the complainant cannot be permitted to go over the testimony again to the same facts even as to the new defendant. He may dismiss his bill without prejudice to a new one making all proper parties, and then retake his testimony. The new defendant may take evidence to any new matter set up in his answer. But if he does not consent to abide by the testimony already taken to matters before in issue, it seems the cause must be heard as to him on bill and answer.

In the principal case the members of the other firm might properly have been made co-plaintiffs. But the variations and additions to the record, if now done by amendment making them plaintiffs, would render it confused. A supplemental bill was held proper, but not necessary. The cause was allowed to stand over with liberty to amend by making the members of the other firm defendants; nothing being requisite but to insert their christian names in the bill and their names in the prayer of process; the former defendants to have the usual time to file a new answer— the cause then to be brought on.

*Held*, upon the merits, that as it appeared that upon the death of R. there was not a cent of money in L.'s hands belonging to him, and the fund was traced to have arisen from the sales of the flour, it belonged specifically to the two firms, and did not go into the general assets.

The fact that the funds of the factor had once been mingled with those of the owners of the flour in the agent's hands was immaterial, it being capable of clear proof that all the money belonging to the factor had been paid away prior to his death.

The cases upon the subject of tracing fund in securities or goods, so as to establish a claim, examined.

A distinction exists between the cases of money in a factor's hands, and a debt due him from a stranger upon a purchase of the goods. In the latter the right of the owner is undeniable. The debt being due from a sub-agent stands upon the same principle.

Where a defendant disclaimed all interest, and then proceeded to answer the bill in detail, he can in no case have more costs than arise upon a disclaimer, or what was necessary to show that he had parted with the interest once held by him.

A defendant who has improperly interfered with a party's right so as to make a suit necessary, may be compelled to answer the whole bill, with a view to charge him with costs, notwithstanding a disclaimer.

THE bill in this cause was filed for the purpose of establishing an exclusive right to a part of certain funds in the hands of the administrators of Francis E. Reed, for which a certificate of deposit in the Farmers' Loan and Trust Company was held, and also to obtain an account and payment of other monies received by the administrators since the death of their intestate, the avails of flour belonging to the complainants.

After the replication was filed, an order by consent was entered into, referring the matters to a master to take testi-

*1840.*

Hutchinson and others

*v.*

Reed and others.

Jan. 24, 25, February 3. March 19.

mony, determine the questions raised by the pleadings, and state the accounts, without prejudice however to any questions, legal or equitable, between the parties. It was made part of this order that the solicitor of the firm of Hutchinson, Campbell & Company, who had filed a bill against the defendants, should receive notice of the proceedings before the master. The report of the master having been duly made, exceptions were taken to it on behalf of the defendants Reed & Halliday, which were now brought on to be heard.

*Mr. John L. Mason,* for the complainants.

*Mr. Owen* and *Mr. Hurlbut,* for the defendants, except the Farmers' Loan Company. Mr. Grim appeared at the hearing on behalf Hutchinson, Bingham & Company, who had appeared before the master.

THE ASSISTANT VICE-CHANCELLOR :—A preliminary objection has been raised at the hearing, independent of the merits involved in the exceptions, viz: that the members of the firm of Hutchinson, Bingham & Co., ought to have been made parties. A brief outline of the case will explain this objection. The complainants and the above mentioned firm were merchants in Detroit, and separately employed Reed, the intestate, as their factor in New-York, to whom they consigned flour, and drew upon him in anticipation of the avails. Reed gave a power of attorney to Schuyler to transact the business during his absence. He left New-York before any flour was sold except a few barrels, and before any thing was collected. It may be assumed for the present purpose, that the whole business passed through Schuyler's hands. Certain collections were made before Reed's death, and others afterwards. The administrators settled with Schuyler, and received from him the sum of $5983 94 in two checks, one for $4983 94, and the other for $1000. The amount of the former with a further sum of $1,275 75, collected for Hutchinson, Bingham & Company, and a small other amount, was

deposited in the Farmers' Loan and Trust Company, and a certificate of deposit for $6,300 issued by that Company. This amount so paid by Schuyler to the administrators is the chief subject of the controversy. The complainants insist that it belongs to them and Hutchinson, Bingham & Company, in ascertainable proportions, and the defendants urge that it is general assets. A judgment creditor of Reed has made a claim upon the fund as entitled to a priority.

1840.

Hutchinson and others v. Reed and others.

I have no doubt that the bill was defective and demurrable for the want of these parties. The claim is a joint one upon the fund which came from Schuyler, and the proportions of the several firms were wholly unascertained. If the complainants obtained a decree for a specific sum, on the ground that the accounts showed so much to be their proportion, the defendants would be subject to a restatement of the same accounts with the other firm, and to the risk that this firm might establish a right to a portion of what had been adjudged to the complainants. On this account, as well as for the reason of a double litigation, the two firms should have joined in the suit. The case would have been different, if the administrators had found and admitted that the relative proportions were ascertained and liquidated. In *Weymouth* v. *Byer*, 1 *Vesey*, p. 422, Justice Buller, sitting for the Lord Chancellor, decided that in a bill by a joint owner of tobacco for an account of the proceeds, the other owner need not be made a party ; the factor having separated the funds, and set aside one moiety for one and the other moiety for the other owner. " The " foundation of the decree," he observed, " is, that the de-" fendants have admitted so much money to be in their " hands for a moiety. This moiety is as distinct as if it " had been sent over by itself in a distinct cargo." In *Treton* v. *Lewis*, (*Rep. Temp. Finch's*, 96,) the bill was to have the plaintiff's share of an adventure with the defendants, who plead that several other persons were interested with them in the concern. The plea was allowed. And in *Smith* v. *Snow*, (3 *Mad. Rep.* 10;) where the bill was filed for an aliquot part of an ascertained sum,

it was held unnecessary to make those interested in the other portions parties. See also, *Calvert on Parties,* p. 124.

In the case of *Deston* v. *Perkins,* (2 *Pick.* 86,) and *Chesterfield* v. *Dehon,* (5 *Pick.* 7,) notes were taken by the factor, in which avails or accounts charged to purchasers, belonging to various consignors, were consolidated. But the factor discriminated the property, and his assignees collected the monies, and the claim of the owners was on this account sustained.

But as this rule which prescribes that Hutchinson, Bingham & Company ought to have been made parties, is entirely for the benefit of the defendants, they may waive it, and submit to account to each firm separately. The order by consent admits of the construction that they have waived it. Still the reservation that it shall not affect the rights, legal or equitable, of the parties, may extend to this point also ; and I think that the proper protection of the administrators requires the bill to be amended. I do not think that a dismissal upon the merits would bar another bill by Hutchinson, Bingham & Company.

An application was made, that in such case the cause should be allowed to stand over, with liberty to amend by bringing them in as parties. Since the decision in the House of Lords, in *Green* v. *Poole,* (4 *Br. P. C.* 122,) bills are never dismissed at the hearing for want of parties ; at any rate where the objection is not taken by answer, except where the court sees that if those parties were before it, the bill would be dismissed, or where they have been omitted in bad faith. (*Ouge* v. *Truelock,* 2 *Molloy,* 35. *Anon.* 2 *Atk.* 15. *Hill* v. *Kirwan, Jacob's Rep.* 162.) In *Van Eppes* v. *Van Duyer,* (4 *Paige,* 76,) the chancellor states, that where the answer takes the objection, and the cause is still brought on, it is in the discretion of the court to dismiss the bill, or allow it to stand over. (*Baldwin* v. *Lawrence,* 2 *S. & St.* 18. *Greenleaf* v. *Queen,* 1 *Peters' Rep.* 149.) It is, however, the usual course, to permit the amendment, and the present is a proper case for it.

But I have found some difficulty in determining whether

these parties may not be brought in as co-plaintiffs, or must be as defendants; and if in either mode, what are the proper terms to be imposed, with a view to the due protection of the rights of the other defendants, as well as of their own. The subject appears to me to justify a careful review of the authorities.

In *Milligan* v. *Mitchell*, (1 *Mylne & Craig*, 444. *Ibid.* 511. 3 *Mylne & Craig*, 72. See also, 1 *Mylne & Keene*, 446,) this subject of amendment at the hearing received much consideration. The bill was by Milligan and Sharp, trustees of a chapel, entitled, by virtue of a resolution, to act in its general management, Milligan being also an elder; and both were pew holders. The defendants were the remaining trustees and the other elders. Witnesses were examined, and at the hearing an objection for want of parties was taken and allowed, and the usual order was made for the cause to stand over, for the purpose of adding parties as the plaintiffs might be advised, or of showing that they were unable to bring all proper parties before the court.

I may here observe, that the right of the plaintiffs to sue, was put on the ground of their being pew holders entitled to vote, and therefore *cestuis que trust*, (3 *M. & C.* 83,) and that the particular clause in the order made at the hearing was in consequence of a suggestion that the number of pew holders was very large.

The plaintiffs amended the bill by adding four persons as co-plaintiffs, and entitling it a bill " on behalf of the " plaintiffs, and all other persons except the defendants, " who are entitled to be pew holders or seat holders, in " the chapel, &c." He introduced additional matter into the body of the bill, stating that the two original plaintiffs, as well as the new plaintiffs, were seat holders in the church, and had duly paid for their sittings, and were not in arrear for pew rents; and also stating, that in consequence of the re-election of Mr. Scott, and the departure from the doctrines of the established church of Scotland, introduced and sanctioned by the other trustees, they were excluded from attending the church, and deprived of the benefit of the church. This

amended bill was filed in 1835. There can be no doubt that between 1833, when the original bill was filed, and 1835, an amendment had been made; for the case then states, that the situation of minister of the chapel was vacant, Mr. Scott having resigned, and that the other trustees were employing persons not licentiates of the church of Scotland to officiate, and sought an injunction.

The bill, amended as above stated, was answered, and the defendants insisted that the amendments were not sanctioned by the order, and that the bill was still defective for want of parties; that all the seat holders should be brought in. Rules to pass publication were given, but no witnesses were examined on either side. The cause came on for hearing before Lord Cottenham, who had made the order to amend, when master of the rolls. He said,—" it was clear that the amendments were most ir-" regular; that under an order made in a cause in which " two persons were plaintiffs, and in which depositions had " been taken, the bill is amended by adding other plaintiffs, " and inserting allegations and charges relating to matters " connected with the new plaintiffs. The course taken was " unjustifiable. The plaintiffs having taken the original re-" cord from the court, and introduced a totally new record, " the witnesses could not be indicted for perjury. They are " depositions in a cause, of which the record no longer " exists."

Certain proceedings then took place which resulted in an order that the amended bill be taken off the file and all subsequent proceedings be set aside, without prejudice to the plaintiffs availing themselves of the order of July, 1835, to amend. The amended bill was withdrawn, and the original bill amended by adding after the names of the plaintiffs, the words " on behalf of themselves and all " other persons, (except the defendants) who, &c., were " holders of seats or pews, &c.," with an averment that the great number of the pew holders, (being upwards of 100,) precluded their being parties. (1 *M. & C.* 511.) And the cause finally came on for hearing, when an objection was taken that the depositions could not be read.

(We are to infer that there was an answer to this amended bill.) This was overruled, the lord chancellor saying, that it was only on the supposition that the parties represented by the plaintiffs had a common interest, that the bill could be sustained at all; and that as to the indictment for perjury, he did not apprehend that any difficulty could arise on that ground.

In *Bailey* v. *Dennett*, 3 *Young & Collyer*, 459, (May 30th, 1839,) the bill was for payment of a legacy left to the plaintiff's wife, and the suit was by the husband alone. Witnesses were examined and the objection for want of making the wife a party being made, the cause stood over with liberty for the plaintiff to amend by adding a co-plaintiff or otherwise, as he should be advised. The wife was then made a co-plaintiff by amendment. When the cause was again brought on, the objection was taken that it was a new record, that no issue was joined upon the record as now framed, and *Milligan* v. *Mitchell* was referred to. Alderson, B., said, that it appeared to him the lord chancellor had decided the point. " He thought at first his " opinion might have reference to the alteration in the " changes of the bill ; but upon further examination, I " think it refers only to the alteration in the parties. The " objection must prevail."

It is remarkable that in this case the final decision of the lord chancellor in *Milligan* v. *Mitchell*, in 3 *Mylne & Craig*, was never adverted to. This robs the decision of its force, for it is placed expressly upon Lord Cottenham's decision in the early stage of that cause ; and that decision, in my opinion, is not reconcilable with the ultimate determination, except upon the ground of a material alteration in the allegations of the amended bill.

In *Malin* v. *Malin*, (2 *Johns. Ch. R.* 238,) the objection was taken at the hearing after proofs had been taken, that a *cestui que trust* was not a party. The chancellor said the cause must stand over to bring her in as plaintiff. The parties consented that she should be named as plaintiff.

In *Kirk* v. *Clark*, (*Prec. in Ch.* 275,) an objection was

1840.

Hutchinson and others
v.
Reed and others.

taken at the hearing, that a *cestui que trust* was not made a party. The court ordered the plaintiff to pay the day's costs, and to make the *cestui que trust* a party, and the former bill and answer and depositions to stand ; and the next day she was made plaintiff by her next friend, she being a married woman, and one of the defendants her husband. He would not make her defendant because it would have taken time to put in her answer.

In *Ensworth* v. *Lambert*, (4 *Johns. C. R.* 605,) the objection taken at the hearing and after a master's report, was, that a mortgagee had not been made a party. The cause stood over with liberty to file a supplemental bill and bring him in.

The same course was pursued in *McGown* v. *Yerks*, (6 *Johns. Ch. Rep.* 450,) where the bill was to foreclose a mortgage, and certain legatees whose legacies were charged upon the premises, were not made parties. A supplemental bill was ordered to be filed.

In *Rogers* v. *Rogers*, (1 *Hopkins*, 511. 1 *Paige*, 188. 2 *Paige*, 467,) the bill was to vacate a sale made under an execution issued by procurement of Halsey Rogers, on a judgment against Thomas Rogers, the ancestor of the complainants. The judgment had been assigned to Halsey Rogers, who was sole executor of Thomas Rogers. Thomas Rogers had left five children. Two sons died during their father's life, one of them leaving three children. Two of these were complainants, together with the husband of one. In 1825 a decree was made sustaining the bill and directing an account. It is not stated in the report in Hopkins that the objection for want of parties was then made, but it appears from the register's book, that in August, 1823, the cause was brought on, and the objection for want of parties taken. The cause was ordered to stand over, and a supplemental bill was filed, bringing in the other heirs as defendants.

A supplemental bill was also resorted to in *Jones* v. *Jones*, (3 *Atk.* 110, 217,) where trustees who had joined in a lease were deemed proper parties to be brought in.

In *Holdworth* v. *Holdworth*, (*Dickens*, 799,) on an ap-

peal from a decree at the rolls, the cause stood over with leave to file a supplemental bill to add parties.

The restriction upon the permission for a cause to stand over is, that it will not be allowed where a new case is to be made, but only where it is to add parties against whom a decree in a plain case will be had. (*Denniston* v. *Little,* 2 *Sch. & Lefroy,* 11, *n. Milligan* v. *Mitchell,* ut supra— and see *Goodwin* v. *Goodwin,* 3 *Atk.* 370.)

In *Bierdman* v. *Seymour,* (2 *Mylne & Craig,* 120,) permission was given at the hearing to amend by bringing in parties interested under the will, under which the complainants claimed. New defendants were brought in who answered, and a further application to bring in others was granted.

In *Niblett* v. *Daniel,* (*Bunbury's Rep.* 310,) it was declared that if the cause is allowed to stand over to add parties, and a new material defendant is added, who is concerned in interest, the depositions taken before cannot be read against him. The reporter adds a *quere*—" Then " what method to take since they cannot examine *de* " *novo ;* publication having passed before ?"

In *Phillips* v. *Gwyn,* in *Scac.* 5th July, 1771, (2 *Fowler's Ex. Pr.,* 184,) where under such an order made at the hearing a new party was added who put in his answer, to which the plaintiff replied, the defendant moved for a commission to prove his answer, which, though strongly opposed, was ordered.

In the *Practical Register,* (p. 300,) it is said that if a defendant be added after publication, the cause as to him must be heard on bill and answer only ; and in *Jones* v. *Jones,* 3 *Atk.* 110, the cause had been before brought on, and an issue directed. When it again came on upon the equity reserved, the objection was taken. Lord Hardwicke said, as there could not be a new examination in the cause, publication having passed, all he could do was to authorize a supplement bill to make the trustees parties, and charge the fraud. A lease was impeached to which the trustees were parties.

It may also illustrate this question, to advert to the de-

1840.

Hutchinson
and others
*v.*
Reed and
others.

cisions upon amendments after answer. In *Hichens* v. *Congreve,* (1 *Simons,* 500,) the bill was filed by some shareholders of a mining company, on behalf of themselves and others ; and after answer of some of the defendants, the bill was amended by adding plaintiffs. On motion to take the bill of the file, or to have the amendments stricken out, the Vice-Chancellor said,—that no injury could fall upon the defendants; for after a bill is amended, a defendant has an opportunity of adding the explanatory circumstances in his answer to the amendments.

In *The Governors of Lucton School* v. *Scarlet,* (13 *Price,* 54. 1 *McCelland,* 17,) an application was made to amend the bill, by making one P., a co-plaintiff. The original plaintiff, it appears, had parted with his interest, by letting the tithes to P. The defendants had answered. The application was refused. It would have the effect of leaving a great quantity of extraneous and irrelevant matter on the record. Garrow, Baron, said,—There must be such a re-casting of the case, that a new engrossment will be necessary. Hullock, Baron, observed,—" The title now " resides in the parties to be inserted, and the plaintiffs " were aware of it. In the cases cited, the addition was a " mere matter of form." See also *Millwood* v. *Oldfield,* (4 *Price,* 325.)

I have taken the pains to examine and state these cases, because I think the question is one of importance in substance, as well as form. It seems to me to be the result, that there is no rule preventing the court allowing at the hearing a bill to be amended, by adding co-plaintiffs. It is to be observed, that when the usual order is made, and another defendant is added, the bill is necessarily so far varied as to insert his name, with such allegations as connect him with the suit. There is then some change in the bill, besides the addition of names. I am at a loss to understand why, if the mere addition of parties as plaintiffs with such connecting words, would produce the result that there was no cause in court under which the depositions could be considered as taken, and hence prevent an indictment, that the same effect must not be produced by

making the new parties defendants. There was an old practice of withdrawing a bill, where the amendment would efface the record, and filing a new one. But this is abandoned, and the original bill always remains. Then if the amendment is made by interlineation, the time is always proveable by the date of the order, or under our practice when the amendment is of course, by the filing of the engrossed copy of the amendments.

Can it then be, that upon an indictment for swearing falsely in a cause, it may not be shown that such was the existing cause when the depositions were taken, though it was afterwards varied ? The judicial proceeding which would be laid in the indictment, was then actually in existence. Such was then the record. (See 4 *T. R.* 550. 1 *Gallison*, 387. 1 *Starkie*, 521. 1 *T. R.* 69.)

But again, the bill in *Milligan* v. *Mitchell*, was amended by adding the words "on behalf of themselves, &c.," and the statement as to the number of the pew holders, after the depositions were taken; and Lord Cottenham treated the objection that the witnesses could not be indicted as deserving little notice. I confess I do not understand why such a variance would be unimportant; and one by adding names of the parties meant to be covered by the general description, would be fatal. I look upon the case therefore, as depending upon the circumstance of the material new allegations inserted in the amendments. And as before observed, if the amendment by adding a plaintiff, by force of the relation of an amendment to the time of filing the original bill, can operate to defeat an indictment for perjury, it unavoidably can so operate where the variance is by adding a defendant. It is not the same record in the one case more than in the other. And then the court has done wrong in every case in which defendants have been allowed to be added by amendment after proofs were taken; a practice as well settled as any in the court. *Seaton on Decrees,* 359, *et seq.*

Then the question of the mode of bringing in new parties is to be governed by the rules of the court, looking to the rights of all the parties, and to its principles in guard-

ing testimony, as well as to the most suitable frame of the record.

If the proposed party is one holding identically the same interest, as a residuary legatee for example, or where he is a *cestui que trust*, I see no objection in making him a co-plaintiff; and convenience may often dictate this as the best course. Where the new party appears to have adverse rights to the plaintiffs, he must be brought in as a defendant. Where the rights of any former defendant may be affected by the introduction, an opportunity must be given to him to present the new points upon the record. This may be done either by amendment with liberty to file a new answer, or by a supplemental bill making them parties, as seems most appropriate in the particular case. It is perfectly clear that such new defendant cannot be bound by the depositions already taken. And I am inclined to think' that the complainant cannot go again over all the testimony to the facts before examined to against the new defendants. This is not fatal to his claim where he has omitted a party against whom he would have a decree, because he is entitled to take a decree of dismissal without prejudice to a new bill upon paying costs, and thus retake his testimony. There can also be no question that a new defendant can go into testimony as to all the facts set up in his answer, not before in issue, or examined to; and perhaps such was the case in *Philips* v. *Gwin*, in the exchequer before cited. But as the new defendant plainly cannot be bound, except where he had a power to cross-examine, and also to produce his own witnesses to the very points in issue before, a case of no little embarrassment may occur. I am inclined to think that the rule stated in the *Practical Register*, though I find nothing else to sustain it, is correct; that as to the new defendant the cause must be brought on upon bill and answer, with this modification, that purely new matter may be examined to.

From the facts now established it appears that the members of the firm of Hutchinson, Bingham & Company, might unite in the bill as plaintiffs without prejudice to

their rights. But the original bill would require so many

variations and additions in amendments to be annexed to it, that the record would be rendered confused; and a new engrossment would be expensive. The proper course is, either to amend by making them defendants, or to file a supplemental bill for that purpose. I apprehend that the answer of the present defendants would have been the same as that they have now put in, had these persons been originally made defendants. If they had had any distinct ground of defence against the claim of these persons it would have been competent for them to set it up; and had the case been brought on in the regular mode of proofs before the examiner, touching the question of the mingling of funds only, and the matters of such separate defence, and the claim sustained, the decree to account would have been modified accordingly. If the case had stood as it now stands as to these points, it would have gone to the master; and the accounts between the co-defendants would have been stated as well as the proportions of the plaintiffs and the other firm. (*Eccleston* v. *Lord Kesmesdale*, 1 *Bevan's Rep.* 396. *Shannon* v. *Marselis*, 1 *Saxton's N. J. Rep.* 424.)

I am not however authorized to assume that the defendants have nothing distinct to set up against the claim of the other firm. And hence, if a supplemental bill is filed, it would be most prudent at least to make them parties. I am, under all the circumstances, of opinion that the order should be for the cause to stand over with liberty to amend by making the members of that firm parties defendant, for which purpose I believe nothing but the insertion of their names in the bill and in the prayer of process is necessary; the defendants who have answered to be at liberty to file a new answer in the usual time after the service of the amendments. Of course if they file an answer unnecessarily, it will be at the risk of paying costs personally. The cause then to be brought on again.

----●----

The cause having been again brought on, the following opinion was delivered.

The material facts which it is necessary to understand, are these. The complainants were merchants in Detroit, and under an agreement with Francis E. Reed, of New-York, made consignments to him of various parcels of flour, drawing upon him in anticipation of the avails. At the same period, other persons at Detroit composing the firm of Hutchinson, Bingham & Company, made similar consignments under a similar arrangement. Reed came under acceptances for the complainants to the amount of $7,778 11, payable at different periods, and for the other house to the amount of $19,245 73. On the 12th day of October, 1838, Reed left the city of New-York for Detroit. At that time his acceptances for the complainants were $9,164 11. The whole proceeds of their flour was $8,086 33; so that he would be in advance, if he paid all the drafts over $900, exclusive of all charges. The acceptances for the other firm were in a far greater degree beyond the value of the flour.

Upon leaving New-York, Reed gave a power of attorney to one Isaac Schuyler to manage the consignment concern, make sales of the flour, and make the necessary disbursements. He died in Ohio on the 11th of November, 1838.

Prior to his departure on the 12th of October, sales had been made of 69 barrels of flour belonging to the complainants, but nothing had been collected. One barrel was charged to himself as of the 16th. The first sum received was on the 16th. Reed had paid before he departed, the sum of $89 64 for freight for the complainants. No sales had been made on account of Hutchinson, Bingham and Company, and only $1 90 disbursed for them.

Under his power of attorney, Schuyler proceeded to make sales of the flour; to pay certain drafts and necessary disbursements attending the business. The course of the transaction was, that Schuyler made the sales; Annin, the clerk of Reed, made out the bills and collected the money, and paid over all the proceeds collected by him, except some small amounts which were kept for store puposes by Annin. I make the amount thus reserved about $565 90. The details will be afterwards stated.

The master under the order of reference entered into by counsel, has found that a certain quantity of flour was received on the complainant's account and another quantity on account of the other firm; that the sales prior to Reed's death amounted to a certain sum. He has found the amount of collections from such sales as well as the disbursements, distinguishing the accounts of the different firms. The accuracy of his report in these particulars is not questioned.

1840.

Hutchinson and others
v.
Reed and others.

After Reed's death, Schuyler continued the collections of the avails of previous sales, and to make new sales of what remained unsold. When the letters of administration were taken out, the residue, being 192 barrels, was sold by the administrators.

It then appears that in the month of December, 1838, the administrators settled the account with Schuyler, and received from him the sum of $5,983 94, for which they gave him a receipt in full. The balance in hand was $6,983 94, and $1,000 retained by Schuyler, is the subject of contest, and will be afterwards noticed. This sum the master has apportioned between the firms.

The administrators received the above sum from Schuyler in two checks, one for $4,983 94, the other for $1000, payable on the 19th of December, 1838. Halliday deposited with the Farmers' Loan and Trust Company, the first amount, viz: $4,983 94, together with the sum of $1,275 75, collected on account of Hutchinson, Bingham & Company, and $40 31 of his own monies, making $6,300, for which he took a certificate of deposite.

It is not contested that the complainants have a right to the avails of their flour collected after Reed's death though sold before, as well as the avails of what was sold by Schuyler or the administrators afterwards. The contest is as to the sum in Schuyler's hands at the death of Reed, and it is impossible to understand this point without an accurate statement of the accounts at Reed's death.

The right of the complainants depends upon the establishment of one of two facts, and upon the determination whether the existence of either gives a legal right to the

fund : *first*, that at the death of Reed, there was not a cent of money in the hands of Schuyler belonging to him ; that therefore, necessarily, the whole belonged to the complainants and the other firm ; and *next*, that if there was any amount belonging to him in Schuyler's hands, it was small, easily ascertained, and all the rest was the money of these parties.

*First* as to the facts. It is undeniable that Reed left the city for Ohio in October, without leaving behind him a dollar of funds. The complainants were at that time indebted to him for his advances, but he was indebted for those very advances to Schuyler. In fact, therefore, he had nothing beyond his liabilities.

The mode, however, in which the case has been presented, and the one most favorable to the defendants, is, to look upon Schuyler as Reed's banker, with whom these monies were deposited, as well as any belonging to himself. There is no controversy but that the monies in Schuyler's hands, for which he was accountable to Reed, arose from the proceeds of the flour, and belonged to these parties, except as to certain sums received from other sources and belonging to Reed, or certain parts of the avails of the flour received on Reed's account.

The question is what are these sums ? The first item pointed out by counsel is the sum of $200 borrowed of Halsted. The facts are these : Annin, the clerk of Reed, borrowed this sum of Halsted, and paid over to Schuyler $170 29, a part of it, applying the residue to the purposes of the store. This was on the 23d of October ; and it is stated that it was borrowed to aid Schuyler in paying the draft of the complainants for $1,000 which he that day took up. On the 30th of October, he repaid Halsted the $200.

Now view it in the light contended for ; viz. that Reed himself borrowed the money and handed it to Schuyler. He had then so much of Reed's money in hand, but by paying Halsted, he discharged himself from liability to Reed, and exonerated Reed from responsibility to Halsted. No money of Reed on this account was in hand after the 30th of October.

1840.

Hutchinson
and others
v.
Reed and oth-
ers.

*Next*, as to the item of $55 67. Annin states that he paid this sum to Schuyler, $54 17 being collected for rent, and $1 50, for a newspaper. This was paid to him on the 1st of November, 1838; and he says that no other monies except this was paid to Schuyler, unless it came from the proceeds of the flour—Schuyler corroborates this statement.

By examining exhibit No. 1, it will appear that this $55 67 most probably is included in the sums of $471 75, charged on the 3d of November.

*Next*, as to the flour purchased of Herrick. It is stated that for the purpose of filling up an order, seven barrels were purchased of Herrick. This was paid for by Schuyler on the 24th of October, 1838, as appears by exhibit No. 1. I am satisfied that the conclusion arrived at upon the argument is correct, *viz.* that this was the flour credited as paid for by Hyer on the 30th of October, 1838, the sum of $59 50. From the 27th to the 30th of October, large sums were received for flour, and a heavy amount paid over to Schuyler. In the sum paid on the 30th or 31st, it is to be assumed that this $59 50, was included. How then will this matter stand? Take it as a private transaction with which the flour account had nothing to do, and it will appear that Schuyler buys for Reed $61 29 worth of flour, and receives for him $59 50.

*Next*, as to inspection fees. As I understand it, one half of these fee sbeing half a cent per barrel, was charged to the purchaser; Reed being answerable to the inspector. When the price of the flour was paid this charge was also received. It may be assumed that this and other small ietms were paid to the inspector by Annin from the money on hand. If then Schuyler received it in the monies handed over by Annin, he received it for the exclusive use of Reed.

But this by no means follows clearly. Schuyler did not receive the whole proceeds of the flour paid for before the death of Reed. It will be found that the whole receipts for both houses were $6,438 46, *viz.* $3,863 71, for the complainants, and $2,574 75, for the other firm; and that

Schuyler received $6,161 55, including the above items, considered as paid on private account.

It may then at least be as well urged that the money for the inspection was in the hands of Annin, retained out of the sales, as that it was in the hands of Schuyler.

But supposing it traced into the hands of Schuyler, then he is to be treated as accountable to Reed for it.

*Again,* the firms are charged in the account with commissions and storage. The flour I understand to have been in Reed's store, and as the agreement between Reed and Schuyler as to compensation to the latter, is not in the case, it may be taken that both these items belonged to Reed, and that Schuyler was accountable to him for them. I find the amount to be $315 08, down to Reed's death. The items are detailed in the statement I have prepared to illustrate this investigation marked A. I have allowed the whole storage and the whole commission on sales to Reed, when perhaps a discrimination ought to be made. But it presents the case rather stronger for the defendants.

Schuyler is chargeable as on Reed's private account with the reception of $170 29, $55 67, $59 50, $3 53, the half inspection fees and the commission and storage account, $315 08. He pays on a clear private account $33; October 5th, $61 29 to Herrick; $200 for rent on the 2d of November; $200 to Halsted; $60 to Mrs. Reed, and $162 50 to Gerard, said to be rent of a house; making together $716 79, and leaving a balance due by Reed to him on the 11th of November, of $112 79.

The counsel for the defendants have then presented their case in another aspect. It appears that on the 2d of November, 1838, the complainants were indebted to Reed, for an excess of advances beyond the avails of flour then collected, in the sum of $604 94. By the 8th day of November, Schuyler had received this balance, and the sum of $524 78 besides, from the proceeds of the complainants' flour.

Let us now consider the bearing of this state of facts. As the agent of Reed, Schuyler pays out of his own monies for Reed—or Reed through Annin pays a portion of it, but

still out of money got from Schuyler—the above sum of $604 84. Suppose the whole in fact directly advanced by Schuyler. Then he holds Reed accountable, and Reed holds the complainants. But the complainants repay the amount, or, (their property being sold,) Schuyler receives the amount. Then the monies are not Reed's lodged with Schuyler, but Schuyler's monies by virtue of his claim on Reed for his advances.

But suppose the advance was in fact made by Annin out of the monies in his hands. Unquestionably these came from Schuyler. There was no other possible source. Then Reed was a debtor on the 8th of November, to Schuyler on this account in the above sum of $604 94, and a creditor of the complainants for the like amount. The avails of the complainants' flour liquidate this debt, and the money restored to Schuyler belongs to him.

The result appears to me clear and inevitable, that on the 8th of November, and so on the 11th, the day of Mr. Reed's death, there was not one cent of his money in Schuyler's hands. On the contrary he was indebted to Schuyler on what may be termed the private account, in the sum of $112 79. Suppose the complainants had given notice to Schuyler after his appointment to keep the accounts distinct, as they had a right to do. (*Killock* v. *Greg*, 4 *Russell*, 285.) Had he then separated all that was purely private with Reed, the latter would have stood indebted as I have stated; and nothing could be more evident than that Schuyler had not in hand any funds belonging to him.

The statements accompanying this opinion will place my views in a clearer light than any lengthened exposition. The principle is to keep the accounts distinct. In A, all that belongs to a mere private account between Reed and Schuyler is stated, and the result is as before mentioned, a balance of $112 79 due Schuyler. By it appears that the advances of Schuyler for account of Reed was $4984 86, of which $3,563 51 was disbursed for the two firms, and $716 79 was disbursed purely on Reed's private account. The difference $704 56, and the $112 72,

1840.

Hutchinson
and others
v.
Reed and
others.

(together $817 28) were then advanced to or for the use of Reed, and manifestly advanced out of the proceeds of the flour. But as Reed was the principal of Schuyler, payment to him until forbidden, was a discharge to Schuyler as against the firms, and hence that sum of $817 28, must be a credit to Schuyler in his account with the firms. B. exhibits that account, in which he is charged with the monies plainly arising from the flour, and credited with the disbursements and payments for the firms and the above amount of $817 28 accounted for to Reed. C. and D. separate this account and distribute the items between the firms, showing how it stood with each on the 11th day of November, 1838, as well as subsequently.

Now what can be more clear than the fact, that on the 11th of November, Schuyler had not in his hands one cent belonging to Reed in his own right. That he had paid him as agent of the firms, $817 56, and had in hand the sum of $1176 41, to be accounted for to such firms, or to Reed as agent of such firms. He owed H., B. & Co. $1,583 98, and the complainants owed him $407 29, repaid by the 16th. In statements E and F, the accounts between the firms and Reed's estate are stated. The $817 38 paid by Schuyler to Reed is apportioned among them, according to their respective shares of the whole sales.

Again, the whole sales down to November 11, amounted to $6,438 46, of which Schuyler received $6,172 56, that is $6,161 55 less $288 99 received from other sources. (See A.) The difference then, or $565 90 must have been returned by Annin, and Reed's estate is properly accountable for that. This is also apportioned in the same manner as the sum of $817 28. And from these statements a balance appears due from Reed to each of the firms. The account with each firm and Schuyler, being carried on in C. and D. shows due to the complainants December 11th, $1,268 08, and to H., B. & Co. $5,715 96 : total, $6,984 04, differing ten cents from the actual balance due by Schuyler, as by his account produced in evidence, viz. $6,983 94.

This being the state of the accounts the question arises,

if it justifies the claim of the plaintiffs. There had been a mingling of the funds of the owner and the factor in an agent's and banker's hands. There was none at the day of the factor's death; for he had none. I should have thought that the statement of the case would have borne with it its solution; but I find it necessary to advert to the decisions, not only from the able comments of counsel, but because the question in this form has never within my knowledge, been determined.

*Scott* v. *Surman,* ( *Willes' Rep*. 400,) is a leading case. The plaintiff had consigned a quantity of tar to Richard Scott. The factor sold the tar on the 28th of March, 1739. It was to be paid for in notes payable four months after delivery, with a deduction of £31 due from the factor to the vendees. On the 1st of April, 1740, the vendees gave their two notes, which with the £31 made up £200 a part of the purchase money. On the 3d of April, 1740, the factor committed an act of bankruptcy, and a commission issued on the 5th. The two notes were given to the assignees, and they received the money. The assignees had settled with the purchasers and had received the balance, being £378 4s. The action was by the owners of the tar; and they recovered as well the amount of the notes, as the sum afterwards received on a settlement, but not the £31; for which they came in as general creditors.

The principle of this case is, that if the avails of the owner's goods can be identified in the shape of notes of a purchaser, uncollected at the bankruptcy, they may be recovered. And the case of *Garrat* v. *Cullum,* cited and approved of, decides the same thing, in a case where no notes or evidences had been taken, but a charge was made to the vendee of the goods in the ordinary manner; the vendee not knowing to whom the goods belonged. They were delivered as the goods of the agent, and before payment he became bankrupt.

In *Taylor* v. *Plumer,* (3 *Maule & Selwyn,* 562,) a draft was intrusted to a broker to buy exchequer bills for his principal. The broker received the money and purchased American stock and bullion, intending to abscond. He

1840.

Hutchinson and others
*v.*
Reed and others.

was taken before quitting England and surrendered the stock and bullion. He became bankrupt on the day of his misapplication of the money. The assignees suing for the amount were held not entitled to it.

The language of Lord Ellenborough in this case is comprehensive and explicit. " It makes no difference in " reason or law into what other form, different from the " original, the change may have been made, whether in " that of promissory notes for the money produced by the " sale of goods, or into other merchandise; for the product " or substitute for the original thing still follows the nature " of the thing itself, as long as it can be ascertained to be " such, and the right only ceases when the means of as- " certainment fail; which is the case when the subject is " turned into money, and mixed and confounded in a " general mass of the same description. The difficulty " which arises in such a case is a difficulty of fact and " not of law, and the dictum that money has no ear mark " must be understood in the same way; *i. e.* as predicted " only of an undivided and undistinguishable mass of cur- " rent money."

The law of this great mass of cases is stated by Mr. Justice Bennett, in *Ryall* v. *Rolle*, (1 *Atk.* 172,) and it is needless to go beyond his opinion for this purpose. " Sup- " pose goods are consigned to a factor who sells them and " breaks, the merchant for the money must come in under " the commission; but if the money is laid out on other " goods, these goods will not be subject to the bankruptcy. " Suppose instead of selling the goods for ready money, " he sells for money payable at a future day, and breaks " before the day; if the assignees receive the 'money it " will be for the use of the merchant; or suppose the factor " had taken notes for the goods, if his assignees receive " the money upon these notes, it will be to the merchants' " use."

Although, in *Miller* v. *Race*, (1 *Burr.* 457,) it is said that bank notes cannot be followed as identical and distinguishable from money, but are always considered as money or cash, yet this must be understood with qualifi-

cation. In *Gladstone* v. *Hadwen*, (1 *Maule & Selwyn*, 517,) where a party had got bills of exchange upon a fraudulent promise to give security which was void, and after an act of bankruptcy gave up some of the bills, and some bank notes part of the proceeds of the discount of another, the party was held entitled to retain the latter as well as the former against the assignees.

In *Ex parte Sayres*, (5 *Vesey*, 170,) the bills of the owner had been discounted and the agent received the amount. This was mixed with his own funds. But he then remitted a certain sum to Lisbon to purchase coin as directed by the owner, which not being procured, the money was returned in bills. In the interval the agent became bankrupt, and the bills got into the hands of the assignee. The lord chancellor sustained the claim of the owner to these bills; observing that if the money got into the general fund, it got out again.

In *Ex parte Moldant*, (3 *Deacon & Chitty*, 351,) it was established in proof that the bankrupt was the agent of the petitioner, and the latter had previous to the bankruptcy demanded the property and revoked the authority. The assignees were ordered to give up unsold goods, and to allow the petitioner to sue in the name of the assignees and bankrupt, but the court refused to make any order as to monies received by the bankrupt and mixed with his own.

In *Denston* v. *Perkins*, (2 *Pick.* 87,) an auctioneer sold goods of several owners to one person, and took a negotiable note to himself, which he transferred to his assignees for the benefit of his creditors, who received the money. The interest of each party interested in the notes was adjusted and distinguished. The court said that in many cases it might be difficult for a consignor to trace his property in the hands of a factor or his assignees, and it might then be necessary to resort to a court of chancery for that purpose; but that here the distinction was made, and there was a remedy at law.

The case of *Chesterfield Man. Co.* v. *Dehon*, (5 *Pick.* 7,) is to the same effect.

These are all the cases I deem it necessary to notice

upon the question of bankruptcy.    There are a few, more distinctly upon the point as between the owner and the personal representatives of the factor.

In *Trecothick* v. *Austin,* (4 *Mason,* 29,) Justice Story, after stating the rule that personal property, which can be clearly traced, whether goods, securities, stocks, or other things, is not assets, says : " But if the testator has money " or other property in his hands, belonging to others, " whether in trust or otherwise, and it has no ear mark, " and is not distinguishable from the mass of his own " property, the party must come in as a general creditor ; " and it falls within the description of assets of the testator. " This is the settled law in bankruptcy and the adminis- " tration of assets."

In *Burdett* v. *Willett,* (2 *Vernon,* 638,) Willett, the factor, had sold goods to the defendants *Wingfield* and *Bowater,* for £115, and died before payment, indebted by specialty.    The administrator insisted that the money belonged to the estate as general assets.    It was decreed that the factor was in the nature of a trustee only, and the administratrix could only take what was due for services. An action had been brought at law for the money by the administratrix, a verdict obtained, and the bill was for an injunction.

In the leading case of *Whitcomb* v. *Jacob,* (1 *Salkeld,* 160,) it was settled, that if a factor died after selling the goods and receiving the money, the fund would be general assets ; but if the money was vested in other goods, those goods shall be taken as the merchant's property and not the factor's.

It is obvious from this view of the authorities that there is a marked distinction between the case of money in the factor's hands, and a debt due from another on account of the purchase of the principal's goods.    In the latter case the right of the principal is unquestionable.    I do not see any distinction between such a case and the present.    The money in the sub-agent's hands is proven to have belonged as exclusively to the owners, as if that sub-agent had been the purchaser of the goods himself.    Nothing was due by

him to the factor. Whether the right of an owner shall prevail, in a case in which a sub-agent or banker has funds in hand, owing in part to the factor, and in part to the owner, yet capable of a clear separation and ascertainment, it is not necessary to decide. I am satisfied of the existence of the right in the present instance.

I have found it necessary, in order to ascertain the liability of the defendants to each of the firms, as well as the proportions of the funds which they are severally entitled to, to enter minutely into the accounts. The collections after November 11th, were $8,441 01, $2,572 05, on account of complainants, and $5,867 96, on account of H., B. & Co. Of this sum, Schuyler received $6,974 58. The balance, $1,466 43, is chargeable to Reed's estate. It should be noticed that the master finds $1,493 21 to have been the amount collected ; but $62 22 of it was cash in the drawer. It must be right to assume the $1,466 43, as the true sum collected. This amount of the collections is chargeable to Reed's estate, as made by the administrators, or Annin for them, since Reed's death. It appears that $1,275 75 of this sum was for a bill of flour sold Norton, November 13th. This, it appear from the exhibit, was on account of H., B. & Co., where the bill stated appears to be $1,309. The answer sets forth that part of the deposit on the 4th of December, was $1,275 75, monies arising from flour of H., B. & Co. I take this, therefore, to be the exclusive property of that firm. And the residue of the $1,466 43, viz : $190 08, to be divisible in proportion. The $4,983 94, which was paid to the administrators by Schuyler and deposited in the Trust Company is divisible between the firms according to the amount due them in account with Schuyler, and the $1000 received from him, and not deposited, is divisible in the like manner.

I have considerable difficulty with regard to the $1000 retained by Schuyler. Undoubtedly he has no right to it as against the firm, which have paid to Reed the usual commissions. But I am not yet prepared to say that the administrators have made themselves personally responsible

for the amount. My present impression is, to order that the cause be retained for the purpose of enabling the parties to sue Schuyler at law for the amount, if so advised ; and to apply to this court again, if after the result of such suit, it shall be found requisite. I will hear the counsel to this point upon settling the decree.

The administrators have, perhaps, not acted with candor and openness towards the parties, nor given them readily the information they were entitled to. The addition of a trifling sum of his own money to the large amount deposited in the Trust Company, by Mr. Halliday, is a singular circumstance—difficult to understand, except upon the supposition of a plan to conceal. Yet, on the other side, Mr. Halliday promptly places the great mass of the monies of the estate, received by him, in a safe and a public institution. I think, upon the whole, the administrators cannot be deprived of their costs.

As to the claim of the defendant Southmayd to costs. The bill alleges that the defendants, the administrators, had transferred to Southmayd the certificate of deposit, in order to secure him from loss in becoming their surety in the administration bonds. The answer denies that the certificate was forthwith or ever had been transferred to the defendant, or handed over to him, or that he ever had or now has the same in his possession, or in any manner under his power or control. He disclaims all right or interest in the subject matter of the suit, or to the monies or effects in the bill claimed. Not content, however, with thus meeting what concerned him, he answers all the material allegations of the bill in detail. The pleading is entitled a separate answer, not an answer and disclaimer.

It would be out of the question to give him more costs than would arise upon a short answer, meeting the allegation relating to his peculiar connection with the cause; stating to whom he had transferred any interest previously held, and disclaiming. It is true that where a defendant, by making claim to a fund and preventing its transfer to the true owner, has rendered a suit necessary, and has therefore been joined, his disclaimer will not protect him

from answering the whole bill, because his conduct may have subjected him to the costs. (*Graham* v. *Coape*, 3 *Mylne & Craig*, 640. *De Beauvoir* v. *Rhodes*, there cited.) But the reason of such a rule is this: *first*, that the defendant did once claim the interest, and did press his claim, so as to prevent the transfer to the plaintiffs. *Next*, that the interference was illegal and inequitable, not merely because he had no right, but because the plaintiffs had the right. Hence he must answer all the statements of the bill tending to show as well the plaintiffs' title as his own improper opposition.

So, in *Deacon* v. *Deacon*, (7 *Simons' Rep.* 378,) a suit was caused by an improper claim upon a fund. A disclaimer was put in of any right to it—and the defendant stated various reasons why he should be exempted from costs. Issue was taken upon these, and his statements were falsified, and he was ordered to pay costs.

In the present case the bill alleged that the defendant had the certificate delivered to him, and hence made him a party as interested in it. This he denies, but it turned out in proof that he had the certificate once in his possession ; but what is even of more importance upon the question, he had an undoubted interest in it, as Shipman, Ayres & Company held it for his use. And in the pleading itself it is not averred that he never had or claimed, or at the filing of the bill had not, and did not claim to have, any interest in the subject matter. (*Lube*, 388. *Willis' Eq. Pl.* 615.)

It is then undeniable that the complainants had just ground for making Southmayd a party on the information they possessed, as it is plain that he once had an interest in the certificate, and does not pretend that he never had. He has driven the complainants to prove the allegation of their bill, that he had a claim upon it, and they have substantially succeeded. Had he stated the facts as they occurred, with an averment that notwithstanding those facts, he never claimed an interest, and did not then claim it, I am inclined to think he might have had the

costs of a short answer.  But as it stands I do not consider him entitled to any.